


Yoav M. Griver
ZEICHNER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, New York 10022
(212) 223-0400
Attorneys for defendant AIG Marketing, Inc.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

REVEAL ANALYTICS INC.

                Plaintiff,

      - against -

AIG MARKETING INCORPORATED

                Defendant.

Case No: _____

---

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. § 1441, defendant AIG Marketing, Inc. ("AIGM")
hereby removes to this Court an action styled Reveal Analytics Inc. v. AIG Marketing
Incorporated, Index No. 80/602057, nominally pending in the Supreme Court of the
State of New York, County of New York (the "State Court Action").

In support of this removal, AIGM avers:

1.      Pursuant to 28 U.S.C. § 1441(a), AIGM may remove to a United
States District Court for the district in which a state court action is brought, a civil
action of which the district courts have original jurisdiction.

1

2.      This Court has original jurisdiction over the State Court Action pursuant to 28 U.S.C. § 1332.  Upon information and belief, the matter in controversy exceeds the sum or value of $75,000., exclusive of interest and costs and is between citizens of different states. Upon information and belief, as set forth below AIGM is not a citizen of the State of New York.

3.      As set forth in his Summons, dated July 23, 2008, plaintiff Reveal Analytics Inc.'s ("Reveal Analytics") principal place of business is New York, New York. Upon information and belief, Reveal Analytics was at all relevant times a corporation or business entity existing under the laws of the State of New York.

4.      Defendant AIGM was at all relevant times, a corporation existing under the laws of the State of Delaware, with its principal place of business in the State of Delaware.

5.      The State Court Action was first filed with the County Clerk's Office, County of New York on July 14, 2008. The AIGM Legal Department was served with, and first received a copy of, the Summons and Verified Complaint in the State Court Action on July 21, 2008.

6.      The issues raised by the Verified Complaint in the State Court Action have not been joined, and the date on or before which defendant AIGM is required to answer or move under the New York Civil Practice Law and Rules with respect to the Verified Complaint has not lapsed.

7.    In accordance with 28 U.S.C. § 1446(a), all pleadings in this action are annexed hereto as **Exhibit A**. These documents include the Summons and Verified Complaint, and constitute all process and pleadings in the State Court Action to date.

8.    This Notice of Removal is timely effected pursuant to 28 U.S.C. § 1446(b).

9.    Pursuant to the foregoing, AIGM files this Notice of Removal, thereby removing the pending State Court Action to the United States District Court for the Southern District of New York.

10.    Pursuant to 28 U.S.C. § 1446(d), a Notification of Removal will be filed in the Supreme Court of the State of New York, County of New York, together with a true and correct copy of this Notice of Removal.

WHEREFORE, removing party AIG Marketing, Inc. respectfully requests that this action be removed from the Supreme Court of the State of New York, County of New York, to this Court, that this Court accept jurisdiction of this action, and that this action be placed on the docket of this Court for further proceedings, as though this action had been originally instituted in this Court.

Dated:    August 11, 2008

By: _____
     Yoav M. Griver
     Zeichner Ellman & Krause LLP
     575 Lexington Avenue
     New York, NY 10022
     Tel: (212) 223-0400
     Fax: (212) 753-0396

     Attorneys for AIG Marketing, Inc.

3

Exhibit A

AMERICAN CLERICAL SERVICE

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-------------------------------------------------------X Index No.

REVEAL ANALYTICS INC.                                    Date Summons Filed:

Plaintiff designates
New York County as the
**Plaintiff,**                                           place of trial.

The basis of venue is
- against -                                              Plaintiff's Principle Place  086 0 2 0 5 7
of business and agreement.

**SUMMONS**

AIG MARKETING INCORPORATED

Plaintiff resides at:
**Defendant.**                                           765 Riverside Drive; 6D
New York, NY 10032

-------------------------------------------------------X


To the above named Defendant:

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and
to serve a copy of your answer on the Plaintiff's attorney within twenty (20) days after
the service of this summons, exclusive of the day of service, where service is made by
delivery upon you personally within the state, or within thirty (30) days after completion
of service where service is made in any other manner. In case of your failure to appear or
answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Dated: July 3, 2008

                Law Office of Luis Trujillo Jr. PLLC
                By: LUIS TRUJILLO
                350 Fifth Avenue – # 7720
                New York, NY 10118

FILED
JUL 14 2008
COUNTY CLERKS OFFICE
NEW YORK

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
--------------------------------------------------------X

REVEAL ANALYTICS INC.                                        **Index No.**

                          Plaintiff,

                       - against -

                                                            **VERIFIED COMPLAINT**

AIG MARKETING INCORPORATED

                          Defendant.
--------------------------------------------------------X

08602057

Plaintiff complaining by his attorneys, Law Office of Luis Trujillo., states and alleges:

<u>AS AND FOR THE FIRST CAUSE OF ACTION</u>

1.      At all times hereinafter mentioned Plaintiff resides in County of New York, State

of New York.

2.      At all times hereinafter mentioned, AIG MARKETING INCORPORATED

(AIG), was a Delaware Stock corporation with Principle Place of Business located at One

AIG Center, Wilmington, DE 19803.

3.      At all times hereinafter mentioned Plaintiff, REVEAL ANALYTICS (REVEAL),

has principle place of business located at 765 Riverside, 6D, New York, NY 10032, County

of New York, State of New York.

4.      On or about October 15, 2004 AIG and REVEAL entered into an agreement.

*(See Exhibit A).*

5.      The agreement required the plaintiff, REVEAL, to develop a sales calls

forecasting system for AIG.

6.      The agreement provided, there would be a 13-week time frame for completion

with several milestones through completion for a total price of $295,000.

FILED
JUL 14 2008
COUNTY CLERKS OFFICE
NEW YORK

7.    As per the agreement, AIG agreed to compensate Plaintiff for delays caused by them in reaching the milestones.

8.    The late payment fee structure the parties agree was detailed in the agreement in paragraph 16 *"Performance Delays – Purchaser."* (See Exhibit B)

9. Defendant caused multiple delays during several stages, initially by failing to supply Plaintiff with the necessary data to create the program.

10.    In the eighth week of the project AIG decided to obtain new data for the call center data set.

11.    Furthermore, throughout the first thirteen weeks of the project, AIG was unable to supply accurate call center data required to build the software.

12.    As a result each time REVEAL received data for another month, it had to update the models and re-test them.

13.    REVEAL had to build 48 models and had to re-test each model every time an additional month of data was provided.

14.    This forced Plaintiff, REVEAL to expend unanticipated, additional expenses and man-hours because of the aforesaid changes by AIG.

15.    AIG caused increase delays while it contemplated use of actual data over billed data for use in creation of the software.

16.    After the project was well underway, AIG requested that REVEAL use actual data on the calls received instead of data on calls billed by AT&T, a major change resulting in delay.

17.    AIG took months to decide whether to proceed with the actual data delay or the billed data.

2

18.    Meanwhile REVEAL spent considerable effort developing architecture for the changed data set.

19.    AIG then decided not to change to actual data while REVEAL spent substantial time and extra effort preparing for it.

20.    AIG's lack of cooperation from their IT department hampered performance of Plaintiff's obligation under the agreement.

21.    AIG failed to return emails or calls, and missed scheduled meetings that required REVEAL to travel to Delaware for a meeting which was cancelled without advance notice.

22.    AIG's IT department did not provide REVEAL with the necessary requirements for deployment of the software, such as the environment, the versions of software, the files, and the format needed.

23.    This created significant additional work for REVEAL, because it had to build the program without the benefit of knowing these specific requirements which the IT department refused to provide REVEAL until 2007.

24.    Plaintiff is entitled to contractual compensation for the time needed in performing its duties under the agreement arising from delay fees for the period of time AIG caused aforementioned delays.

25.    By reason of the above, Plaintiff is entitled to calculated additional funds arising from Defendant' Delay of the project.

WHEREFORE, the Plaintiff, demands judgment to be entered against the Defendants:

A)  on the first cause of action, in the sum of $795,000.00;

B)  for costs and disbursements;

C)  for any other and further relief which to this Court seems Just, equitable and proper besides interest, costs and disbursement and reasonable attorneys fees..

Dated:  July 3, 2008

Law Office of Luis Trujillo Jr. PLLC
By: LUIS TRUJILLO
350 Fifth Avenue – # 7720    New
York, NY 10118

4

SUPREME COURT
STATE OF NEW YORK
COUNTY OF NEW YORK

OUMAR NABE, being duly sworn, states that he is the Plaintiff in this action and that

the foregoing petition is true to his own knowledge, except as to matters therein stated to be

alleged on information and belief and as to those matters he believes it to be true.

OUMAR NABE

NOTARY

LUIS TRUJILLO ESQ
Notary Public, State of New York
No. 01TR6115710
Qualified in Westchester County
Commission Expires October 12, 20_08_

## PROFESSIONAL SERVICES AGREEMENT

This Agreement is entered into as of October 15, 2004, by and between **Reveal Analytics, LLC**, with offices located at 765 Riverside Drive, Suite 6D, New York, New York 10032 ("Reveal Analytics" of "Vendor"), and **AIG Marketing, Inc.**, a Delaware corporation with offices located at One AIG Center, Wilmington, Delaware 19803 ("AIGM" or "Purchaser").

**WHEREAS**, Vendor has developed an inbound sales call forecasting system known as ValueManager™ (the "Software") and intends to license the Software to Purchaser under a separate Master Software Licensing Agreement (the "Software Licensing Agreement"); and

**WHEREAS**, Vendor responded to a Request for Information ("RFI") presented by AIGM, a copy of which is attached hereto and made part of this Agreement, the primary purpose of the RFI being to gather information on the Software in order to determine whether said product would meet the functional and technical requirements of AIGM; and

**WHEREAS**, the parties signed a Statement of Work on March 14, 2003 which set forth the scope of the project (the "March SOW"); and

**WHEREAS**, Vendor prepared and submitted a document entitled AIG Marketing Inbound Sales Call Forecasting, dated May 19, 2003 (the "Project Charter") based upon the March SOW, a copy of which is attached hereto and made a part hereof, proposing solutions for Purchaser's forecasting needs; and

**WHEREAS**, based on Vendor's responses to the RFI and the contents of the Project Charter and the March SOW, Purchaser desires to have Vendor develop an inbound sales call forecasting application as set forth in this Agreement, using data and inputs supplied by Purchaser; and

**WHEREAS**, in conjunction with the license to the ValueManager™ Software, Vendor shall provide Purchaser with implementation services, training, maintenance and support services (collectively, "Professional Services") governing the build of applications and solutions designed to address the marketing forecasting, call center staffing projections and other business needs of Purchaser;

**NOW THEREFORE**, IN CONSIDERATION OF the mutual promises herein contained, Vendor and Purchaser agree as follows:

1. Scope of Services. Vendor shall perform for Purchaser the services listed in the "Statement of Work" as set forth in Appendix A attached hereto ("Services" or "SOW"). The SOW includes a listing of specific deliverables and time frames within which the deliverables shall be completed ("Project Milestones"). Vendor agrees to perform all Services required under this Agreement in a professional and workmanlike manner.

2. <u>On-Site Support</u>. Purchaser shall supply on-site Vendor employees with suitable office space, desks, storage, furniture and other normal office equipment support, including computer machine time, telephone service, postage, copying, secretarial, and general office supplies which may be necessary in connection with the performance of Services described herein.

3. <u>Cooperation</u>. Vendor and Purchaser acknowledge that the rendering of Services in connection with this project will require the cooperation of Purchaser. In addition to the On-site Support provisions under Section 2., Purchaser will cooperate with Vendor by: (i) providing Vendor with pertinent, relevant information and materials concerning those portions of Purchaser's business operations as may be reasonably required by Vendor to fulfill its duties and obligations under this Agreement; (ii) making available to Vendor (a) a primary contact person at AIGM and appropriate personnel of AIGM as determined by AIGM and subject to available AIGM resources, (b) workspace, equipment and materials in AIGM's offices as reasonably necessary for Vendor to perform the Services and (c) appropriate development time on Purchaser's systems so as to permit Vendor to implement the Services, provided that the foregoing shall be at such reasonable times so as to not unreasonably disrupt the conduct of Purchaser's business; (iii) reviewing and approving Vendors deliverables on a timely basis and providing comments and other input when the deliverables are presented for review; and (iv) providing a contact person, as determined by Purchaser and as referenced above, to coordinate AIGM required resources and to serve as a resource for Vendor in connection with the Services who has the authority to recommend decisions for AIGM.

4. <u>Acceptance</u>. Each Project Milestone set forth in the SOW requiring acceptance by Purchaser shall be deemed accepted by AIGM thirty (30) days after completion unless AIGM provides written notice to the contrary stating with specificity its reasons for not accepting the implementation. If Purchaser fails to accept implementation for justifiable and reasonable cause, the time period for performance of the deliverables under the Project Milestones in the attached Statement of Work, along with any payment obligations shall be suspended by the length of the period of the delay up to the time of acceptance. All payment obligations shall thereupon resume after acceptance by Purchaser.

5. <u>Rate of Payment for Services</u>. This Agreement constitutes a time and materials contract. Purchaser shall pay Vendor for Services in accordance with the compensation schedule set forth in Appendix B attached hereto. Vendor's Fee Structure for additional SOW's is set forth in Appendix B.

6. <u>Reimbursement for Expenses</u>. Vendor shall be reimbursed by Purchaser for all reasonable expenses incurred by Vendor in the performance of Services, including travel expenses of Vendor employees while away from Purchaser's principal office, and local travel from Purchaser's facilities. All travel by Vendor personnel shall be in accordance with Purchaser's

standard policy governing travel and business expenses. Purchaser shall further reimburse Vendor for any and all special or unusual expenses incurred at the request of and approved by Purchaser. Vendor will be reimbursed for travel expenses and lodging from its home offices to Purchaser's office in Wilmington, Delaware with appropriate receipts. Any travel by Vendor or Vendor's employees must be approved by Purchaser prior to the expenses being incurred. A copy of the Purchaser's travel policies are attached as Appendix C.

7.   Invoicing. Purchaser shall pay the amounts payable to Vendor hereunder in accordance with the Payment Schedule as set forth in Appendix B, as soon as practical upon receipt of invoices submitted by Vendor where such invoice is not disputed in good faith within ten (10) business days. Invoices shall be sent in accordance with the Payment Schedule in Appendix B during the time Vendor is performing Services. A closing invoice will be sent upon completion of last Project Milestone as more fully set forth in the attached Statement of Work. All invoices submitted for payment will be accompanied by substantiating documentation including time sheets, indicating hours worked and work performed, receipts for reimbursable expenses incurred, and other records to allow Purchaser to ascertain the correctness of invoices.

8.   Confidential Information.   The terms and conditions of the Confidentiality and Non-Disclosure Agreement executed by the parties and dated February 18, 2003 are hereby incorporated into this Agreement by reference and shall apply to this Agreement as if set forth herein in full.    In addition to the provisions set forth therein, neither party shall disclose to any nonparty to this Agreement any confidential information of the other. As used herein, "Confidential Information" means any information which relates to any party's research, development, trade secrets, proprietary products or business affairs, but does not include information which (i) is at the time of disclosure publicly known; (ii) was already known by the receiving party at the time of disclosure; or (iii) is lawfully received from a third party not bound under a confidentiality agreement with Purchaser or Vendor. Vendor shall be responsible for insuring compliance with the terms of this Section 7 by its personnel, which it uses to provide Services to Purchaser. Vendor and Purchaser acknowledge that in the event of a breach or threatened breach of the provisions of this Section 6, remedies at law will be inadequate and that either party shall be entitled to an injunction to enforce this provision; provided, however, that nothing herein shall be construed to preclude the injured party from pursuing further remedies. Information publicly known that is generally employed by the trade at or after the time the undersigned first learns of such information, or generic information or knowledge which the undersigned would have learned in the course of similar work elsewhere in the trade, or information independently developed by the undersigned or information lawfully received from third parties, shall not be deemed part of the Confidential Information. Notwithstanding the above and subject to the provisions of this Agreement governing the ownership of intellectual property, any Confidential Information entered into any Purchaser computer information system shall become the property of Purchaser and shall not be removed, copied, duplicated, disclosed or transferred from any such computer information system without prior written consent of Purchaser.

9. Employees. (a) Neither Vendor nor Vendor's personnel are or shall be deemed employees of Purchaser. Vendor shall take appropriate measures to ensure that its personnel who perform services are competent, and adequately covered for workplace injuries; (b) Vendor reserves the right to determine which of its personnel shall be assigned to perform Services, and to replace or reassign such personnel during the term hereof; provided, however, that if Purchaser so requests, Purchaser shall have the right to interview the personnel of Vendor proposed to be assigned to perform Services and, upon receipt at any time of written notice by Vendor that any person is not suitable to Purchaser, Vendor shall, as soon as practicable, remove such person from performance of Services; (c) So long as Vendor is performing Services under this Agreement, and for a period of six (6) months thereafter, neither party will, except with the other party's prior written approval, solicit or offer employment to the other party's personnel engaged in any efforts under or relating to this Agreement.

10. Use of Work Product. The parties agree that the Services are being performed and the work product resulting from these Professional Services provided are being done at the direction of the Purchaser and are to be considered work for hire and that, upon payment of all fees due under this Agreement, all rights in and to all original material prepared for Purchaser and arising out of the Services including but not limited to algorithms, programs, listings, printouts, documentation, notes, flowcharts, card decks, programming aides and other programming documentation shall belong exclusively to Purchaser, no rights being reserved to the Vendor.

11. Development of Applications for Purchaser Use. The Services provided by Vendor to AIGM are for the exclusive benefit of AIGM. "AIGM Developed Application Products" shall be defined as the algorithms and other work product using data proprietary to and/ or provided, disclosed or supplied by AIGM and developed specifically for AIGM using the Vendor's proprietary Marketing Model Forecasting System for inbound sales call forecasting known as ValueManager™ to meet Purchaser's business forecasting needs. Business forecasting needs include, but are not limited to sales, marketing, operations, and financial projections. Upon payment of all fees due under this Agreement, all Developed Application Products are and shall be the exclusive property of AIGM and shall be delivered to AIGM promptly at AIGM's request from time to time or at completion of development, whichever is earlier. AIGM may share all AIGM Developed Application Products with any of its affiliates.

12. Ownership Rights of AIGM Developed Application Products. Although Vendor has sole and exclusive proprietary rights to ValueManager™ , to the extent any intellectual property right arise as a result of any of the Services provided by Vendor for Purchaser under this Agreement, Vendor shall grant and agrees to grant to AIGM rights, title and interests in the AIGM Developed Application Product, including all services, products, inventions (patentable or unpatentable), trade secrets, and copyrights, together with any applications for patents which may issue thereunder and registrations of copyrights, which are embodied in or

cover the AIGM Developed Application Products and are discovered, created, developed or otherwise acquired by Reveal Analytics or any of its representatives, or subcontractors solely in connection with the development of AIGM Developed Application Products (collectively, "AIGM Developed Application Rights"). Upon request of AIGM, Reveal Analytics shall, at AIGM's expense, do or cause to be done all things reasonably necessary to enable AIGM to register, file, prosecute, maintain and protect trade secrets, copyrights, and applications for patents and patents issuing on such applications, and to perfect the full ownership and right, title and interest in all the rights and properties described hereinabove in this Section. For purposes of clarification, AIGM Developed Application Rights shall not include rights in (a) ValueManager$^{TM}$; (b) items developed by Vendor prior to the date of this Agreement; (c) obtained by Vendor from a third party, and for which Vendor has no legal right to provide such, right, title and interest or (d) independently developed by Vendor without access or reference to any information provided by AIGM, whether before, during or after the development of AIGM Developed Application Products.

13. <u>Right of Use- Software License Agreement</u>. Vendor shall enter into a Software Licensing Agreement with Purchaser in a form and with content substantially similar to Appendix D, for the purpose of permitting Purchaser to use Vendor's proprietary software, ValueManager$^{TM}$. The costs for the ValueManager$^{TM}$ software license is set forth in appendix B. Vendor agrees that the Purchaser shall be granted a non exclusive, perpetual license for the continued use of the Software to support the AIGM Developed Application Products produced pursuant to this Agreement.

To the extent that any of Vendor's intellectual property is incorporated into the AIGM Developed Application Product delivered hereunder, Vendor grants AIGM a non-exclusive, revocable for breach, and royalty-free license to use such property, as integrated into any work product, for AIGM's or any of its affiliates' use of the Services. Vendor shall retain the unlimited right to use its knowledge, experience, and know-how including, without limitation, processes, ideas, concepts, tools, and methodology developed prior to and in the course of performing this Agreement, in other engagements. Notwithstanding any provisions under this Section to the contrary, any and all data or information supplied by AIGM in connection with the Services shall remain the property of AIGM.

14. <u>Term</u>. This Agreement shall commence on the Effective Date and continue until the completion of all Project Miles as listed in the Statement of Work or until terminated as provided herein (the "Term").

15. <u>Termination</u>. Services under this Agreement shall terminate upon (i) the completion of the Services by Vendor; (ii) thirty (30) days after the Vendor's receipt of written notice from Purchaser to terminate Services; (iii) thirty (30) days following written notice by Vendor to Purchaser of any default by Purchaser hereunder (including without limitation failure to make any payment when due), if Purchaser fails to cure such default within said thirty (30) day period; (iv) thirty (30) days after Purchaser's receipt of written notice from Vendor to terminate Services;

or immediately upon notice by a party if the other party (A) is adjudged insolvent or bankrupt, (B) institutes or has instituted against it any proceeding seeking relief, reorganization or arrangement under any laws relating to insolvency (and, in the case of any such proceeding instituted against it, the proceeding is not dismissed within sixty (60) days after filing), (C) makes any assignment for the benefit of creditors, (D) appoints a receiver, liquidator or trustee of any of its property or assets, or (E) liquidates, dissolves or winds up its business. Purchaser shall be liable for the payment of all charges and full reimbursement of Vendor expenses until termination in accordance with the Payment Schedule as set forth in Appendix B.

16. Performance Delays- Purchaser. The Parties expect the Services to be provided in accordance with the time schedule in the SOW. However, to the extent any delays directly caused by AIGM are demonstrated to prohibit Reveal Analytics from implementing the Project Milestones in the SOW, the implementation schedule may be delayed. In such event, Vendor shall have the right to bill AIGM for any additional time incurred to complete the implementation at Reveal Analytics' then-current hourly rates as set forth in Appendix B. Reveal Analytics shall first notify AIGM in writing of any substantial delay and provide AIGM an opportunity to cure or remedy any alleged delay prior to incurring any additional costs.

17. Performance Guarantees - Vendor. The Parties expect the Services to be provided by Vendor as represented in this Agreement. If, however, during the term of the Agreement and up to six (6) months following the completion of the Services, in the unlikely event AIGM reasonably determines that Vendor has demonstrated that it is not capable of performing its obligations under this Agreement, or has failed to deliver the Services as set forth in Project Milestones; or, if the AIGM Developed Application Products do not perform forecasts substantially in accordance with the accuracy set forth in the March SOW, AIGM shall provide written notice to Vendor and shall engage in good faith negotiations with Vendor to come to a mutual understanding regarding a resolution of any disputes. In the event such good faith negotiations do not resolve the dispute, AIGM may terminate this Agreement upon thirty (30) days prior written notice for failure of the Software to perform in accordance with the warranties and representations made by Reveal Analytics in this Agreement or upon failure of Reveal Analytics to deliver the services as set forth in the Statement of Work or for failure of Reveal Analytics to meet the deliverables as set forth in the Project Milestones. AIGM shall be obligated to pay only those costs incurred up to the time of such notification.

18. Effect of Termination. In the event of termination for failure to perform by Vendor, AIGM shall be entitled to retain any portion of the AIGM Developed Application Product for which Fees have been paid. In the event of termination by Vendor for breach of Purchaser, AIGM shall return or destroy any portion of the AIGM Developed Application Product for which Fees have not been paid.

19. Warranty. Vendor warrants to Purchaser that Services to be provided hereunder will be original work or in the public domain and of the kind and quality designated and will be

performed by qualified personnel, subject to such supervision and instructions as may be provided or imposed by Purchaser.

20. Limitation on Liability. In no event shall Vendor be liable for special or consequential damages, whether or not the possibility of such damages has been disclosed to Vendor in advance or could have been reasonably foreseen by Vendor. Except for matters involving personal injury, infringement of intellectual property rights and third party claims, Vendor's liability on any claim or loss arising out of, or connected with, this Agreement, including breach of contract or warranty, negligence, or for the sale, delivery, or use of any material, data or programs, or the results of any Services furnished hereunder, shall in no case exceed the amounts paid to Vendor by Purchaser with respect to such materials, data, programs or services, or parts thereof, involved in the claim.

21. Indemnification by Vendor. (A) Vendor shall defend, indemnify and hold Purchaser and its predecessors, successors, parents, subsidiaries, affiliates, officers, directors, shareholders, investors, employees, agents, representatives and attorneys harmless from losses, damages, costs and expenses arising out of or relating to third party claims, actions or demands ("Claims") that: (i) Purchaser's normal operation, possession or use of Vendor's work product infringes any U.S. copyright, U.S. patent, U.S. trademark or any other U.S. intellectual property rights of a third party; or (ii) Vendor's gross negligence or willful misconduct. Purchaser shall give Vendor prompt written notice of all Claims for which indemnity is sought hereunder and shall provide Vendor with: (i) all related documentation in Purchaser's possession or control relating to such Claims; and (ii) reasonable assistance to Vendor in the defense of such Claims. Vendor shall control the defense or settlement of any such claim. Purchaser shall have the right to participate in the defense of such claim with counsel of Purchaser's choice at Purchaser's own expense. Notwithstanding the foregoing, Vendor shall not have any liability or indemnification obligations to Purchaser under this Agreement to the extent that any infringement or claim thereof is based upon or arises out of: (a) use of the work product by Purchaser in combination with equipment, materials, products or software not supplied by Vendor where the work product would not itself be infringing; (b) Vendor's compliance with designs, plans or specifications provided by Purchaser to Vendor; (c) any unauthorized repair, adjustment, modification or alteration to the work product by Purchaser or any third party; or (d) any refusal by Purchaser to install and use a non-infringing version of the work product offered by Vendor to Purchaser.

(B) If the work product becomes the subject of a claim as set forth in Section A. above or Vendor believes that the work product is likely to become the subject of a claim, Vendor may, at its sole discretion and expense: (i) obtain a license from such third party for the benefit of Purchaser; (ii) replace or modify the work product so it is no longer the subject of a claim; or (iii) if neither of the foregoing is deemed by Vendor in to be commercially feasible terminate this Agreement. This Section B and the indemnification obligations in Section A states the maximal liability of Vendor with respect to any intellectual property infringement caused by the work product.

(C) Subject to Section 21(A) above and except to the extent any Claim is a result of a breach by Vendor of this Agreement, Purchaser shall defend, indemnify and hold Vendor and its predecessors, successors, parents, subsidiaries, affiliates, officers, directors, shareholders, investors, employees, agents, representatives and attorneys harmless from losses, damages, costs and expenses arising out of or relating to any Claims based upon: (i) information or materials provided by Purchaser to Vendor in connection with the Services; or (ii) Purchaser's ultimate use of the Services after completion by Vendor. Vendor shall give Purchaser prompt written notice of all Claims for which indemnity is sought hereunder and shall provide Purchaser with: (i) all related documentation in Vendor's possession or control relating to such Claims; and (ii) reasonable assistance to Purchaser in the defense of such Claims. Purchaser shall control the defense or settlement of any such claim. Vendor shall have the right to participate in the defense of such claim with counsel of Vendor's choice at Vendor's own expense.

22. Purchaser's Audit Rights and Reports. Vendor shall maintain complete and accurate records relating to this Agreement (the "Records"). Vendor undertakes to provide Purchaser with reports which and any updates thereof as may be required to determine whether Vendor has complied with the Services provided under this Agreement. Purchaser shall have the right to inspect the Records to verify Vendor's compliance with the terms of this Agreement. This audit may be conducted at Purchaser's sole expense no more than once during each quarter during reasonable business hours, upon ten (10) business days prior written notice and in a manner designed to minimize the disruption to Vendor's business. Purchaser's right to audit shall survive for a period of six (6) months following termination of the later of this Agreement for any reason.

23. Complete Agreement. This Agreement and the Appendices, including the Software Licensing Agreement and ValueManager Software License Maintenance and Support Agreement attached hereto, comprise the entire Agreement between the parties hereto with respect to the matters covered herein. No other Agreements, representations, warranties or other matters, oral or written, purportedly agreed to or represented by or on behalf of Vendor by any of its salesmen, personnel or agents, or contained in any of its sales materials or brochures, shall be deemed to bind the parties hereto with respect to the subject matter hereof. Purchaser acknowledges that it is entering into this Agreement solely on the basis of the agreements and representations contained herein.

24. Severability. If any term or provision of this Agreement shall be found by a court of competent jurisdiction to be illegal or otherwise unenforceable, the same shall not invalidate the whole of this Agreement, but such term or provision shall be deemed modified to the extent necessary in the court's opinion to render such term or provision enforceable, and the rights and obligations of the parties shall be construed and enforced accordingly, preserving to the fullest permissible extent the intent and agreements of the parties herein set forth.

25. <u>Notices</u>. Any notice in connection with the subject matter of this Agreement shall be in writing and shall be effective when delivered personally to the party for whom intended, or five (5) days following the deposit of the same into the United States mail, certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below its signature to this Agreement. Either party may designate a different address by notice to the other given in accordance herein.

26. <u>Assignment</u>. This Agreement may not be assigned or otherwise transferred by Purchaser to third parties other than affiliates of the Purchaser without prior written consent of Vendor, nor may Vendor delegate its duties hereunder without the prior written consent of Purchaser. Except as provided in the preceding sentence, this Agreement shall be binding upon and inure to the benefit of the heirs, successors, assigns, subcontractors, and delegates of the parties hereto.

27. <u>Taxes</u>. Software delivered pursuant to Services under this PSA shall be delivered via "load and leave." There shall be added to any charges payable by Purchaser under this Agreement amounts equal to any and all applicable taxes, however designated, levied or based on any charges payable under this Agreement or the services rendered hereunder, including without limitation state and local privilege, excise, sales, and use taxes and any taxes or amounts in lieu thereof paid or payable by Vendor, but excluding taxes based upon the net income of Vendor. Purchaser will be billed by Vendor before or within a reasonable time following payment of such taxes by Vendor, and such amounts shall be due and payable by Purchaser promptly following billing thereof, whether or not such billing occurs following completion of the Services hereunder. Notwithstanding, AIGM shall only be responsible for the payment of taxes on items purchased or services used.

28. <u>Income and Withholding Taxes</u>. Vendor acknowledges that it and its personnel are independent contractors for purposes of income tax withholding and employment taxes. Vendor represents it properly withholds and remits all necessary federal and state income taxes on all its personnel. Vendor also represents it pays all applicable state and federal employment taxes on its personnel. Vendor indemnifies and holds the Purchaser harmless from and against all losses, damages and expenses (including reasonable attorney fees) from an assessment against Purchaser of withholding or employment taxes including interest and penalties thereon attributable to any personnel of the Vendor. Vendor will pay Purchaser an amount equal to such taxes, interest and penalties plus an additional amount sufficient to pay all federal, state and local income taxes resulting from the receipt of such payment.

29. <u>Force Majeure</u>. The performance by Vendor of Services hereunder shall at all times be subject to delay and/or extension on account of circumstances beyond the control of Vendor, including without limitation the unavailability of computer time and required materials and any sickness or other unavailability of Vendor or any of Vendor's technical staff assigned to the performance of Services. Responsibilities of the parties shall be suspended during the period of any such delay and Vendor shall not bill for any services during that period during

which services were suspended.

30. Estimates. Notwithstanding the hourly rate set forth in Appendix B, any estimates regarding time of completion, costs or otherwise which may be rendered by Vendor with respect to Services are given in good faith, but are not to be construed as a guarantee or warranty by Vendor and no such estimate shall be deemed to change this Agreement into a fixed price contract.

31. Additional Services. Upon the oral or written request of Purchaser, Vendor may undertake, to perform services which add to or extend beyond the Statement of Work designated in Appendix A attached hereto. In such event, Vendor may take all reasonable action and expend reasonable amounts of time in accordance with Purchaser's request for such services and Purchaser agrees that, except as may be hereafter specifically agreed upon by the parties hereto, the performance by Vendor of such additional or other services shall be governed by the terms and provisions of this Agreement.

32. Advertisements. Vendor shall not use the name of Purchaser for promotional purposes in any way without the prior written approval of Purchaser. Only upon successful performance of the deliverables in the SOW under this Agreement, and subject to prior written approval, Vendor shall have the right to refer to Purchaser as a customer in promotional materials and press releases, but only with the prior written consent of Purchaser. Purchaser reserves the right of prior review and approval of the use of its name, logo and marks by Vendor.

33. Appendices. The following Appendices, which are attached hereto, are hereby incorporated herein by reference:

> Exhibit 1- Request for Information
> Exhibit 2- Project Charter
>
> Appendix A - Statement of Work
> Appendix B - Schedule of Charges
> Appendix C- Travel and Reimbursement Policy
> Appendix D- Sample Master Software Licensing Agreement

In the event of any conflict between the provisions of this Agreement and any of the provisions set forth in the Appendices referred to above, the provisions of such Appendices shall govern.

34. Law. Vendor shall comply with all applicable laws in performing Services. This Agreement shall be construed in accordance with the laws of the State of Delaware.

11/16/04

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement by their officers thereunto duly authorized as of the date first written above.

| REVEAL ANALYTICS | AIG MARKETING, INC. |
|---|---|
| (VENDOR) | (PURCHASER) |

By:     Oumar Nabe

By:     Michael, J. Sheahan

Title:   President

Title:   Vice President, Finance

Date:   11/16/04

Date:   11/12/04

# APPENDIX A

## SCOPE OF SERVICES

The attached Statement of Work, ("SOW"), including the Project Milestones, incorporated herein and comprise the Scope of Services for this Agreement.

# STATEMENT OF WORK
## For
## AIG Marketing, Inc. (AIGM)
### Inbound Sales Call Forecasting Model Development Phase

This document describes the work required of Reveal Analytics, Inc. for a Staffing Model Solution specific for AIGM. This Phase will encompass both Development and Production Implementation based upon Defined Requirements and Contractual Agreement.

### Overview

This document demonstrates AIGM's need to develop interactive inbound sales call-forecasting model based upon available marketing and call center data.

AIGM's current call forecasting model was developed by an outside entity and is proprietary in nature. AIGM management does not have access to the calculations imbedded in the worksheet. We experience inconsistencies from week to week with the projections and are unable to assume a fixed variance during these time frames. The inputs into this model vary based upon the type of solicitation. The solicitation types currently used are; direct mail, mailing inserts/stuffers, direct television, Internet, AIGM employee notifications, e-mail blasts, magazine advertising, and affiliation marketing. Our model also takes into account multiple follow-up (quote service) and transfer calls generating from these solicitations. The information fed into this model comes from developed marketing curves based on historical experience and the associated call volumes experienced from these solicitation types.

### Work

Reveal Analytic's Team will:

- Develop a daily sales call forecasting model extending for four weeks into the future with a variance of no more than +/-5%
- Develop a weekly sales call forecasting model that will forecast for six months with a variance of no more than +/-5%
- Develop and build a ValueManager Forecasting Data Base integrated with statistical forecasting algorithms to be used by both AIGM Marketing and Operations
- Enable Operations to determine how many FTE to hire and when to hire for budgeting and call center staffing based on anticipated call volumes
- Reduce the number of abandon calls. The required reduction percentage will be agreed upon once detailed specifications are documented.

**Deliverables**

Reveal Analytic's Team will develop the following:
- 24 separate daily sales call forecasting algorithms
- 24 separate weekly sales call forecasting algorithms
- Value Manager Forecasting Data Base
- Data base documentation, as required by the AIGM Data Base Administrator
- User interface or front end for data input, forecast execution and report generation
- Forecasting operational manual with supportive forecasting algorithms
- Training manual
- Detailed functional requirements documentation
- Detailed design and project management documents
- Integration test plan
- Detailed Project Plan
- Acceptance criteria sign off documentation
- Status reports
- Change orders

**Development Schedule – Project Milestones  (See Attached for Detailed Project Milestones)**

| Milestone | Description | Week |
|---|---|---|
| M0 | Discovery/Sign off on Deliverables | 1 |
| M1 | Complete Architecture Design/Data Plan (Algorithm, Front End, Data Input & Data Output) | 3 |
| M2 | Architecture/Data Plan sign off (Algorithm, Front End, Data Input & Data Output) | 3 |
| M3 | Forecasting Model Development Starts | 3 |
| M4 | Architecture Development Starts | 3 |
| M5 | Model Validation/AIGM Feedback Will check with Vendor.. | 5 |
| M6 | Model Validation/AIGM Feedback | 7 |
| M7 | Model Validation/AIGM Feedback | 9 |
| M8 | Architecture Development Complete | 10 |
| M9 | Integration of Algorithms into production environment and Architecture/System Testing | 11 |
| M10 | AIGM Feedback | 11 |
| M11 | Production Rollout | 12 |
| M12 | Technical/End User Training and Handover | 13 |

**Assumptions**

## AIGM

- AIGM will provide a Project Team to work with Reveal Analytics Project Team. The Project Team will consist of primary users and may include representatives from Marketing, Operations, Information Technology and Budget/Financing.

- Managers in Marketing, Operations and IT will be available to provide subject matter knowledge about their environments to Reveal Analytics project team

- All data required to complete the project will be provided by AIGM

- AIGM will provide an environment for performing the required development testing and QA before the project starts.

- AIGM will provide the required hardware and software to deploy the solutions within AIGM

- AIGM will work with Reveal Analytics to facilitate the deployment of the solution

### Reveal Analytics

- Forecasting data base will be integrated by Reveal Analytics with the existing data mart in Operations

- Time zone information will be obtained from AIGM Operations and from third parties doing the mailing for AIGM

- Cost estimates are based on initial effort estimates and may change if additional requirements are identified after the initial design session

- All additional requirements and efforts identified after the initial design session will be charged on time and material basis

- All approved expenses will be billed back to AIGM for actual amount incurred by Reveal Analytics in accordance with AIGM's travel and reimbursement policies.

- All technology and other constraints within AIGM will be identified and discussed by AIGM and Reveal Analytics. A mutual agreement on an action plan will be developed.

- Time constraints that may impact the project will be discussed at project initiation

- Reveal Analytics will provide the human resources to deploy the solution

### User Acceptance

- AIGM and Reveal Analytics will agree on Specific, Measurable, Attainable, Relevant, Time Bound (SMART) objectives

- Forecast results from models will be shared with AIGM to insure they meet the variance requirements set by AIGM for weekly and daily forecast

- AIGM and Reveal Analytics will develop an acceptance form to be signed by both parties

### Model Administration

- AIGM will be responsible for administration of the model
- AIGM will designate an Administrator for the model
- AIGM will designate all persons who will have access to the model
- All persons with access to the model will participate in the training and knowledge transfer
- AIGM and Reveal Analytics will agree to give remote access to Reveal Analytics in accordance with any maintenance and support agreement that will be signed by both parties

## Training & Knowledge Transfer

- AIGM will designate appropriate AIGM staff from both the business and technology sides to be trained
- Reveal Analytics will develop a training manual
- Reveal Analytics and AIGM will agree on a the number of days, the location and timing of the training
- AIGM will provide the location for the training
- Additional training will be made available after completion of the project on a time and material basis, if required
- Reveal Analytics will be available to provide consultation after completion of the project on a time and material basis to improve the models when new products are introduced
- All forecasting algorithms developed will be explained to AIGM
- All forecasting algorithms developed will be owned by AIGM
- Reveal Analytics will retain ownership of its proprietary ValueManager™ Forecasting Engine and the process used to develop the forecast

## Upgrades

We should leave maintenance out of this SOW completely

- Reveal Analytics will readjust the forecasting models at no costs to AIGM in each instance during the first six months of implementation.

# AIG MARKETING, INC.

## INBOUND SALES CALL FORECASTING
## PROJECT MILESTONES

# PROJECT MILESTONES

| Milestones | Description | Week |
|---|---|---|
| M0 | Discovery/Sign off on Deliverables | 1 |
| M1 | Complete Architecture Design/Data Plan | 3 |
| M2 | Architecture/Data Plan signoff | 3 |
| M3 | Forecasting Model Development Starts | 3 |
| M4 | Architecture Development Starts | 3 |
| M5 | Model Validation/AIGM Feedback | 5 |
| M6 | Model Validation/AIGM Feedback | 7 |
| M7 | Model Validation/AIGM Feedback | 9 |
| M8 | Architecture Development Complete | 10 |
| M9 | Integration of Algorithms and Architecture/System Testing | 11 |
| M10 | AIGM Feedback | 11 |
| M11 | Rollout | 12 |
| M12 | Training/Handover | 13 |

**AIGM TO RECEIVE BENEFITS FROM THE NEW FORECAST DURING IMPLEMENTATION**

Reveal Analytics- PSA- eff. 10-15-04 v.fin

Detailed Project Milestones

# AIGM
# INBOUND SALES CALL FORECASTING
# DMAIC PROCESS

# PROJECT MILESTONES

We will use the DMAIC (Define, Measure, Analyze, Improve, Control) process to manage the development and deployment of AIGM Sales Call Forecasting project.

**DEFINE**
  ➢ **M0 (Week 1): Discovery & Sign-off on Deliverables**
  A.  **Team Chartering**
      a.  **Business Case:** Articulate why the project is being undertaken and how it fits into AIGM initiatives (See AIGM Project Charter presented by Reveal Analytics on May 19, 2003)
      b.  **Problem & Goal Statement:** Define what is wrong with the current forecast and articulate AIGM improvement objectives in measurable terms (i.e., daily sales call forecasting model extending for four weeks into the future with a variance of +/-5%). Specify the objectives in Specific, Measurable, Attainable, Relevant (SMART) way.
      c.  **Project Scope:** Define the boundaries of the project: what is in scope and what is not in scope? Start point? Stop point?
          i.  **Constraints:** technology, legal, time, financial
          ii.  **Time commitment from AIGM team members who have to do their "regular jobs" while working on the project**
          iii.  **Assumptions**
              1.  **Available software, hardware, network**
              2.  **Databases**
              3.  **Marketing process (channels, timing of mail drop), Operations processes (time zones, etc...)**
              4.  **Interaction between Marketing and Operations**
              5.  **Profile of end users**
              6.  **Others**

          iv.  **Risk and Dependencies**
              1.  **Availability of DRTV data**
              2.  **Timely delivery/availability of data and accuracy of data**
              3.  **Third party holding AIGM direct mail data**

      d.  **Deliverables:** Review list of deliverables from Project Charter prepared by Reveal Analytics
          i.  **Forecasting models**
          ii.  **Oracle database**
          iii.  **Documentation**
          iv.  **Training manual, etc...**

    e. Milestone: High level project plan (See attached)
    f. Roles
        i. Reveal Analytics team members
        ii. AIGM team members
        iii. Responsibilities of AIGM and Reveal Analytics team members
        iv. Communication plan, change management, project review, acceptance, status reporting, team meetings (See Project Charter prepared by Reveal Analytics)

**B. Customer Focus**

    a. Identify the different AIGM customers/end users of the solution (Marketing, Operations, Analysts, Managers, IT Technical Support Team, etc...)
    b. Identify the needs of customers/end users (frequency and type of forecast reports, delivery mode, user interface, etc...)
    c. Translate customer needs into specific technical requirements
    d. Develop methods for obtaining information on customer needs

**C. Process Mapping (See Project Charter prepared by Reveal Analytics)**

    a. Review the current forecasting process and its relation to Marketing, Operations, IT, Third Party supplier and other business processes
    b. Develop a detailed process map and identify the following components: Suppliers, Inputs, Process, Output, Customers
    c. Insure that the solution being developed reflect the way Marketing, Operations, It and Third Party suppliers operate
    d. Identify all key input factors affecting the forecast: channels, Time Zone, etc...
    e. Identify the boundary of the new process, where the new forecasting process starts (it does not include customer targeting and response modeling) and where it ends (it does not include determining the staffing level at the call centers).

# MEASURE

➤ **M1 (Week 2): Complete Architecture Design/Data Plan**
  **A. Measurement**

    a. Agree on AIGM critical need or Critical-To-Quality-Requirement (CTQ):
        i. Daily sales call forecasting model extending for four weeks into the future with a variance of +/-5%
        ii. Weekly sales call forecasting model extending for six months into the future with a variance of +/-5%
        iii. Quantify the definition of the forecast not being accurate

B. Data Collection
  a. Identify all internal databases and data elements
  b. Identify all external databases and data elements
  c. Link data collection to customer requirements to minimize unnecessary expenditures and avoid delay in deployment
  d. Develop a plan to collect data
  e. Identify internal and external owners of data
  f. Meet with Marketing to identify all data sources and data elements for the forecast
  g. Meet with Operations to identify data sources and data elements for Operations
  h. Meet with IT to define hardware & software requirements
  i. Access and interface requirements & sample data

C. Variation in current forecasting (See Project Charter)
  a. Understand the cause for variation in the current forecast (common cause/special cause)
  b. Meet with Marketing and Operations to identify factors in AIGM business processes that may be sources of variation (drop date, delivery mode, channels, time zone, weather, data quality, etc...)
  c. Understand the delivery requirements of the third party supplier and identify relevant data for the forecast
  d. Output measures: identify measures to track to determine how well AIGM requirements are met
  e. Examine variation from latest forecast results since June 2003

➤ M2 (Architecture/Data Plan Sign-off)
  a. Database schema & interfaces to pull data
  b. Data plan sign-off

ANALYZE (See Project Charter)
  ➤ M3 (Forecasting Model Development Starts)
    a. Detailed data analysis to enhance understanding of the data and factors influencing the forecast
    b. Identification of appropriate modeling tools to meet the AIGM CTQs

IMPROVE (See Project Chart)
  ➤ M4 (Architecture Development Starts)
    a. Prepare detailed Work Breakdown Structures (WBS)
    b. Implement the components of ValueManager™ to support AIGM business process requirements as well as the daily and weekly forecasting goals

    c.  Implement the sampling engine, rules manager, forecast error manager, curve manager, holidays/trading days manager, model configuration

    d.  Define the database schema, data access components

    e.  Develop user interface & reporting mechanism

    f.  Integrate data source into ValueManager™ Forecasting Engine

    g.  AIGM feedback: progress report and evaluation

➤ **M5, M6, & M7 (Model Generation, Improvement Selection, Design, Implementation)**

    a. Prepared detailed Work Breakdown Structure (WBS) to develop forecasting models

    b. Develop up to 48 models taking time zone, channels and other AIGM driven parameters

    c. Validate models developed

    d. Test models for precision (+/-5%)

    e. Share results of models with AIGM for feedback and to improve on-going operations before final implementation

➤ **M8 (Architecture Development Complete)**

    a. Unit testing of architecture components

➤ **M9 (Integration of models with architecture)**

    a. Integration testing

    b. Link AIGM requirements to both models and architecture

    c. Potential problem analysis to identify components or AIGM processes that may need improvement, to improve forecasting results, to track forecast errors, to take action to increase customer (AIGM) satisfaction and to reduce the risk of the forecast error falling outside the targeted level of precision

        1. Failure Modes and Effect Analysis (FMEA)

            * Identify process problems that may reduce the efficiency of the forecasting process

            * Find out how people (end users), equipment, environment and analytical methods can create process problems

        2. Error Modes and Effect Analysis (EMEA)

            * Identify human errors that may result in failure of the application or decreased customer satisfaction

    d. AIGM feedback

➤ **M10 (AIGM User Testing)**

    a.  System testing of architecture components

    b.  AIGM User testing in test environment

    c.  Continuous improvement

    d.  Acceptance

➢ **M11 (Rollout)**
    a. **Deployment of the solution in production environment**
    b. **Configuration of final models**
    c. **Application rollout**

➢ **M12 (Training/Handover)**
    a. **Training of business end users**
    b. **Training of IT staff**
    c. **User documentation**
    d. **Handover to AIGM**
    e. **Team meeting**

## CONTROL (Support/Maintenance): TO BE APPROVED BY AIGM
➢ **Technical support by Reveal Analytics**
➢ **Monitor performance of forecasting models to insure predictable results**
➢ **Implement action plan if forecast goes out of control**
➢ **Update models (when appropriate) by Reveal Analytics**
➢ **Document learning gained and share within AIGM**
➢ **Institutionalize the forecasting process**
➢ **Continuous improvement**

- Third Invoice will be sent at the completion of Model Generation Improvement Selection (Milestone 6) at a rate of $50,000.

- Fourth Invoice will be sent at the completion of Design Implementation (Milestone 7) at a rate of $50,000.

- Fifth Invoice will be sent at the completion of the Rollout (Milestone 11) at a rate of $50,000.

- Final Invoice will be sent for remaining $55,500 at the completion of the Handover Phase (Milestone M12).


All invoices submitted for payment will be accompanied by substantiating documentation including time sheets, indicating hours worked and work performed, receipts for reimbursable expenses incurred, and other records to allow Purchaser to ascertain the correctness of invoices.

## Vendor Fee Schedule- Additional SOW's

The following Fee Structure shall be applicable for additional SOW's for prior approved services beyond the 295,500.00 projected contract price.

| Reveal Analytic Resources | Rate/Hour (US $) |
|---|---|
| Engagement Leader | $250 |
| Sr. Modeler | $120 |
| Jr. Analysts/Programmers (Half Time) | $30 |
| Oracle DB | $80 |
| Java Lead | $80 |
| Sr. Developer | $80 |

## Fee Structure and Costs

### Effort Estimates

| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Leader | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 70 |
| Sr. Modeler | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 65 |
| Jr. Analysts (2) (halftime) | | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | 50 |
| Oracle DB | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 65 |
| Java Lead | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 65 |
| Sr. Developer | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 60 |
| Total | 4 | 4 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 1 | 375 |

### Summary of Costs

| Description | Estimates (US $) |
|---|---|
| Professional Services | $245,500 |
| Software License Fee | $50,000 |
| Maintenance and Support for Software License | $20,000 annually |
| Model Updates (Optional) | To be Priced |

Index No.                                    Year:   2008

SUPREME COURT OF THE STATE OF NEW YORK
THE COUNTY OF SUFFOLK,

REVEAL ANALYTICS INC

                        Plaintiff,

            -against-

AIG MARKETING INCORPORATED

                        Defendant(s).

_____

### SUMMONS AND VERIFIED COMPLAINT

_____

Law Office of
LUIS R. TRUJILLO JR.
*Attorneys for Plaintiff*
1363 5TH AVE; # 201
Bayshore, New York 11706
Tel. No.   (631)665-3087
Fax No.   (631)666-2540

_____

To:                                Service of a copy of within
                                   Is hereby admitted,

Attorney(s) for:      .
                                   Dates: _____, 20____

_____

PLEASE TAKE NOTICE:

        NOTICE OF ENTRY

that the within is a (certified) true copy of a duly
entered in the office of the clerk of the within named court on

        NOTICE OF SETTLEMENT

that an order                       of which the within is true copy
will be presented for settlement to the HON.       One of the
judges of the within named Court, at
on                      at          M.

Dated,

                                   Sincerely,

                                   LUIS R. TRUJILLO JR.